**M. A. HOLAHAN, Trustee in Bankruptcy of the Raven Corp., and the Raven Corporation**

v.

**J. Harry HENDERSON and Perry Huey Coleman.**

**M. A. HOLAHAN, Trustee in Bankruptcy of the Raven Corporation, and the Raven Corporation**

v.

**J. Harry HENDERSON and Miss Rosalie Henderson.**

**M. A. HOLAHAN, Trustee in Bankruptcy of the Raven Corporation, and the Raven Corporation,**

v.

**J. Harry HENDERSON and Perry Huey Coleman.**

**M. A. HOLAHAN, Trustee in Bankruptcy of the Raven Corporation, and the Raven Corporation,**

v.

**J. Harry HENDERSON.**

Nos. 11488–11490, 12200.

United States District Court W. D. Louisiana, Alexandria Division.

Aug. 31, 1967.

James O. Manning, New Orleans, La., Alfred A. Mansour, Alexandria, La., for trustee.

Grove Stafford, Alexandria, La., for J. Harry and Rosalie Henderson.

**892**

Leonard Fuhrer, Alexandria, La., for Perry H. Coleman.

EDWIN F. HUNTER, Jr., District Judge:

Plaintiff in each case is the trustee of a corporation in bankruptcy. The cases concern requests by the trustee that certain funds expended by Raven Corporation before its bankruptcy be placed back in his hands for the benefit of the corporation's creditors.

Defendants in the cases are J. Harry Henderson, the controlling stockholder and former president of Raven; Perry Huey Coleman, a former employee of Raven; and Rosalie Henderson, J. Harry Henderson's sister and a stockholder.

The Raven Corporation's voyage on the ocean of enterprise was, almost from the beginning, ill-starred. It was organized on March 18, 1961, as a Louisiana corporation, and was provisioned with the usual plenary powers allotted to maiden corporations by their promoters. The primary purpose of the corporation, however, seems to have been to conduct the business of renting and operating work-over rigs in oil fields in and around southern Louisiana. For this purpose, the omens looked good. The work-over business was strong and most of its participants prospering. It had 12,000 shares of paid-in, one-dollar par stock, and before the end of April, 1961 had received $18,000 for eighteen debenture bonds in the sum of $1,000 each. It had also the participation and services as vice-president of stockholder John O'Connor of New Orleans, a man familiar with the ins and outs of the work-over business. So with good expectations the corporation established its office in New Orleans, entered into lease-purchase agreements for a couple of drilling rigs, and commenced operations.

As sometimes is the case, however, the wind and weather over the horizon were not as they had appeared from the port. For a time business gross was good but expenses were high. There was some dispute among the stockholders and operators as to the propriety of some claims against the corporation. The rigs did not stay as busy as had originally been anticipated. The corporation began to lose money.

The one bright aspect in an otherwise dark situation was provided on March 20, 1963, when one of the company's rigs was destroyed by fire. Although the rig was only worth some $100,000 on the company's books, it had, at the insistence of the insurance companies, been insured at $375,000, its replacement value. What acumen and effort had been unable to provide, disaster had provided—a profit.

But the corporate bilges still leaked. Tacks into various other enterprises relating to the oil business—well producing, the buying and turning over of leases— could not bail them out. Quoth the Raven Corporation, "nevermore," and it filed voluntary bankruptcy in the United States District Court for the Eastern District of Louisiana, scuttling itself sadly on the hardest shoal in the seas of commerce, on October 7, 1964.

The duly appointed trustee in bankruptcy, Mr. Holohan, quite properly concerned himself with poking through the wreckage. In the company's records and history he found several transactions with which he was dissatisfied. For the benefit of the corporation and its creditors he filed the following actions, which were tried before this Court.

*Civil Action No. 11,488* involved perhaps the most startling aspect of the company's history. In June of 1963 Mr. Henderson, as president of the corporation, wrote to Mr. Coleman $103,000 in checks from the Raven Corporation. The purpose of the checks was to provide Coleman with funds to buy oil and gas leases for the company in Grant Parish. Mr. Coleman cashed the checks and set upon this enterprise. However, he reported that some ten days later he left the cash in a small home in Colfax, which building he had planned to use as his office during the purchase of the leases. That building burned to the ground, destroying literally all remnants of the cash left in it. Plaintiffs argue that

this story is not worthy of belief, that the money should be returned to the corporation, and at least by implication that Mr. Henderson, Mr. Coleman, or both, converted it to ends of their own.

*Civil Action No. 11,489* concerns the payment by Raven to Rosalie Henderson, on April 20, 1963, of $20,958.90 for the face value of and interest on company debentures held by her. Plaintiffs argue that Mr. Henderson and his sister should place this sum back in the hands of the corporation.

*Civil Action No. 11,490* seeks the return to the corporation by Messrs. Henderson and Coleman of $17,028.31 paid to Coleman on April 24, 1964. This payment, on record, was for salary and expenses for thirteen months' work for Raven, from March 20, 1963 to April 20, 1964.

*Civil Action No. 12,200* involves the payment on June 3, 1963 of $26,253.64 to the Texas-Pacific Coal and Oil Company under an invoice received by Raven for its share of expenses in working interest on a dry well. This working interest was acquired by Raven from its president, Mr. Henderson. At the time of the invoice and its payment, the well had been plugged as dry for almost a month. Plaintiffs consequently maintain that this payment constituted the assumption of an obligation which Mr. Henderson himself would otherwise have had to pay, and that the corporation received no consideration for such an assumption, inasmuch as the well was dry and worthless.

We consider the cases separately:

CIVIL ACTION NO. 11,488 HOLAHAN, TRUSTEE, AND THE RAVEN CORPORATION VS. J. HARRY HENDERSON, JR., AND PERRY HUEY COLEMAN

On June 12, 1963, Henderson, as president of the corporation, wrote Coleman $103,000.00 in checks on the corporation's account. As reflected in the record of a May 25, 1963 directors' meeting, Coleman was to proceed to Grant Parish, Louisiana to buy oil and gas leases there. The leases were then to be sold again, or "turned over," to potential producers at a profit to the corporation. Coleman cashed all the checks the same day at the Hibernia Bank in New Orleans. He proceeded to Grant Parish and set up his office for the lease play in a small home adjacent to the home of an aunt, since deceased. He placed the cash in an oaken cash box and placed the box on the upper shelf of a cabinet. During the evening of June 22, 1963 the building burned to the ground and the cash was destroyed completely. Or such was the story as reported by Coleman.

Plaintiffs insist that the story is not to be believed; that it is just too incredible. Counsel for plaintiffs cite a long list of cases involving bankruptcies and suspicious disappearances of property or money. Most of these cases are on point, if at all, only in a general sense. They were not, for the most part, centered around the issue of whether a particular accounting for a bankrupt's funds was to be believed or not. They stand for no principles by which such accountings are to be believed or not to be believed. Perhaps the best summary of the situation was the Eighth Circuit's in Seigel v. Cartel, 8 Cir., 164 F. 691, at p. 692: "The credibility and reasonableness of his [the defendant's] story were addressed to the judicial discretion of the District Judge."

This discretion is not to be lightly exercised. Nothing could be more unsettling than the thought of the defendants rifling through a stack of cash in the amount of $103,000 after judgment has been rendered in their favor—nothing, that is, unless it be the thought of the defendants saddled with a judgment for such a large sum which they did not in fact convert, and do not in fact have in their possession. Equally perturbing is the reflection that the question is almost entirely one of credibility. There is little evidence to discredit defendants' story, or to substantiate it. There are only the details of the story itself.

The only contradictory evidence offered by plaintiffs concerned the pur-

chase of leases by Henderson and Coleman for W. T. Burton of Lake Charles, shortly after the fire. Also introduced by plaintiffs were various bank account statements of Henderson and Coleman. The suggestion was that the $103,000 was converted to buy these leases and secure a profit on their turnover to Burton. But there are no cash flows reflected between Coleman and Henderson, or vice versa, or between either of them and the lessors involved, which are at all commensurate with the sum said to have burned. The evidence as to the Burton deal shows no more than that Henderson and Coleman had oil and gas activities outside their interests in the Raven Corporation—a fact which no one denies.

Although the story is on its surface an unlikely one, defendants have adequately answered and explained questions relating to its more bizzare aspects. Why was such a sum given to Mr. Coleman? To engage in a lease play then very active around Grant Parish. Expert testimony, taken by deposition, establishes that this particular area was "hot" at the time. Why was cash to be used, instead of checks, in purchasing the leases? Because small landowners prefer it, and most of the leases were to be bought from small landowners. Why were all the checks cashed at once, instead of as needed? Henderson intended them to be cashed as needed, and had written the checks all at once because he was leaving Louisiana to attend golf tournaments with his wife. But Mr. Coleman decided in his absence that cashing all the checks at once would save time that otherwise would be spent in commuting to Alexandria to obtain cash as needed, and that frequent trips to Alexandria banks might put people onto the fact that the lease play was being conducted. This would make bargaining harder, and might invite competition. Why were not the local Grant Parish authorities informed after the fire of the presence of the cash in the house? Because defendants feared a smaller, more localized, but equally energetic version of the mid-Nineteenth Century gold rush if such a rumor were to

get out. In other words, the outstanding oddities of the tale are met with consistent explanations, which explanations are met in turn merely with plaintiffs' repeated assertion that the tale is too incredible on its face to be believed. This naked assertion is not enough to tip the scales against defendants.

Surely, Henderson, a successful and respected business man, had no reason to participate in a scheme of fraud against his company. In June of 1963 the Raven Corporation was solvent, due to receipt of insurance proceeds on the rig fire of March, 1963. The March 31, 1963 balance sheet showed a total deficit of $133,413.57, before receipt of the insurance proceeds. Receipt of the $375,-000 insurance, therefore, pushed the corporation back into comfortable solvency. Since Mr. Henderson, his wife, and his sister together owned 9,000—or 75 per cent—of Raven's 12,000 shares of common stock, it is unlikely that Henderson would seek to defraud his own solvent company as suggested. He would have nothing to gain, and would stand to lose not only the legal and social penalties attached to criminal acts, but also the presumably substantial fees for Coleman's hypothetical nefarious services. Mr. Henderson did not pass the matter off as being of no importance, as plaintiffs imply. As we recollect the evidence, he was on the verge of apoplexy when he received news of the fire. The atmosphere in his office was anything but relaxed for some time thereafter.

The Raven Corporation had a right to buy oil, gas and mineral leases. The Board of Directors authorized the company's president to acquire oil, gas and mineral leases and to spend $100,000 of its funds buying oil, gas and mineral leases. Henderson was acting within this authority when he issued checks to Coleman to acquire leases. He expected Coleman, a company employee, to carry out his instructions and the orders of the Board of Directors, i. e., to use the money to buy leases. After delivering the checks to Coleman, Henderson never saw them again, did not have them in his

possession, nor did he ever see the proceeds. Henderson had no part in the fire at the Coleman house, nor was he responsible for it. Henderson never had possession of the money, nor did he have possession of the checks after giving them to Coleman. No one has connected Henderson with the money, nor placed it in his possession at any time, before or after the fire. These observations, and the further observation that Henderson's personal gross income for 1963 was over $100,000 and his net worth over $1,-000,000 render preposterous any suspicion that Henderson was involved in arson.

It is conceivable that Mr. Coleman, without Mr. Henderson's knowledge, could have perpetrated fraud both upon Raven Corporation and Henderson. The Court takes note that in the case of P. Coleman, v. Manufacturers Casualty Company, 229 La. 105, 85 So.2d 47 (1956), the Supreme Court of Louisiana did not accept testimony of this same defendant as to a theft loss on a liquor store owned by him. There, he had the burden of proof. The case involved an insurance claim by Coleman for the loss, and both the district and supreme courts denied the claim. This circumstance makes it difficult to reach a decision as to Coleman's liability. But there is no proof here that Coleman's story is not true. It is consistent and not contradicted, if weird, and is further supported by the muse that Henderson continues to retain him as an agent.

After the fire, defendants contacted Mr. Frank N. Proctor of the Currency Redemption Division of the Treasury Department in Washington. They sent at his request a limited quantity of ash to Washington where it was unsuccessfully examined for reclaimable currency. Mr. Proctor's testimony at trial was that the process for redeeming burned currency is purely mechanical and involves no chemical test to show whether currency ashes are or are not present, and that no currency was found in the ashes furnished to him. It is not likely that defendants, had they committed fraud,

would have then sought the government's aid to investigate the fire for remnants of the currency. As it happened, other debris from the fire showed signs of such complete combustion as to lead Mr. Proctor to conclude that paper currency would not be expected to survive a fire of such intensity.

## CONCLUSION

■ This Court has jurisdiction of this cause by virtue of Title 11, Section 46 U.S.C.A. The section of the Bankruptcy Act which could be applicable here is Section 70(e), which is 11 U.S.C.A. § 110(e) (1). Here, this presents purely a factual question. Did Mr. Henderson and/or Mr. Coleman steal $103,000 of the Raven Corporation's money? Our thoughts and findings on this query have heretofore been set out.

In case No. 11,488 there should be judgment for defendants. There is.

## CIVIL ACTION NO. 11,489 HOLAHAN, TRUSTEE, AND THE RAVEN CORPORATION VS. J. HARRY HENDERSON, JR., AND ROSALIE HENDERSON

Raven issued $18,000 of debentures, all of which were owned at the time they were paid by Miss Rosalie Henderson. She had acquired these debentures before maturity and for value, paying the company itself $12,000 for the first twelve and buying the other six from her brother. He, in turn, had paid the corporation $6,000 for those issued to him. On April 20, 1963, the corporation paid these debentures and the interest that had accrued on them. The total paid, including interest, amounted to $20,958.

Here, the trustee seeks to recover this amount from Miss Henderson and her brother, J. Harry Henderson, under Section 70(e) of the Bankruptcy Act. The Trustee's position is that § 70(e) arms the trustee with authority to set aside any preference or transaction voidable under state law, and that under LSA–R.S. 12:27 directors are liable who knowingly and without exercising due diligence vote favorably for

an unlawful return of assets to a shareholder. In essence, this contention is that Henderson, a director and principal stockholder of the corporation, returned a capital contribution to his sister in violation of LSA–R.S. 12:27. Mr. Warren Garfunkel, an attorney and certified public accountant, testified that in his opinion, although the indebtedness was called debentures, it was in truth and in fact a capital contribution.

■ We agree with plaintiffs that in determining the nature of these debentures, we should look at the substance of the matter and not the nomenclature used. Whatever one might wish to call these instruments, they were still debts, direct obligations of the Raven Corporation, and not in our judgment a part of its capital structure. These debentures reveal on their face that they are direct promises on the part of Raven to pay the holder a fixed amount on a certain date. Stock indicates a part ownership of a business, a pro rata share in the ownership of the assets. If the business prospers, the stock becomes more valuable. Had Raven prospered to the extent of making millions, Miss Henderson's debentures were worth $18,000 and interest, and no more.

■ Were the Court convinced that the indebtedness was in fact capital stock, this case should still be decided for the defendant. A solvent corporation can run a stock redemption if it chooses; solvent corporations, no doubt, do so daily. On April 20, 1963, Raven was solvent. There is nothing wrong with a solvent corporation paying its matured obligations, even though the creditor is a stockholder, a director and an officer. The fact that the corporation later becomes insolvent, and 18 months later goes into bankruptcy, does not make the payment illegal, fraudulent, nor voidable, under the Louisiana law.

The plaintiffs' demands should be rejected. They are.

## CIVIL ACTION NO. 11,490 HOLAHAN, TRUSTEE, AND THE RAVEN CORPORATION VS. J. HARRY HENDERSON AND PERRY HUEY COLEMAN

On April 28, 1964, the Raven Corporation paid to Perry H. Coleman salary and expenses for a period from March 20, 1963 through April, 1964. The amount paid was $17,028.31 (salary of $13,000 and expenses of $4,028.31). On October 7, 1964 Raven filed a voluntary petition in bankruptcy. The Trustee contends that under Section 67(d) (2) of the Bankruptcy Act, 11 U.S.C.A. § 107(d) (2), these payments are voidable.[1]

The evidence reveals that Mr. Coleman went to work for Raven as assistant to the president on or about March 20, 1963. Subsequently, on May 25, 1963, Mr. Henderson's action in hiring Coleman was ratified by the Board of Directors, and the latter's duties and salary were set forth. Coleman was to receive $1,000 per month salary, and was to be reimbursed his expenses while traveling. Mr. Coleman was a long time associate of Mr. Henderson and his duties for the corporation were well worth the amount of the salary he was paid. The business (operating work of rigs in the Gulf of Mexico) operated around the clock, and many demands were made upon Coleman in connection therewith at all hours of the day and night. It is true that Mr. Coleman did not totally abandon all other activities during the 13-month period in question (March 20, 1963 to April 20, 1964), but Coleman did devote the major portion of his time and efforts to his job

---

I. 11 U.S.C.A. § 107, sub. d(2) (b) provides: "Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent * * * (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent."

with Raven. Other employees of the company drew full salary to the very end of the company's business.

We find no evidence to support the allegations of the petition to the effect that the payment of the salary of $13,000, and expenses in the amount of $4,018.31, constituted a fraudulent scheme to divert funds of the corporation to the prejudice of existing and future creditors.

Counsel for plaintiffs state the issue succinctly: "It therefore narrows itself to the legal proposition of whether the funds were paid to Perry H. Coleman for a fair consideration and in good faith." As for "fair consideration," there can be no question but that on the record Mr. Coleman earned and was due what he was paid. The major thrust of plaintiffs' argument is directed to their argument that fair consideration is to be distinguished from good faith. This is hardly possible under the definition of fair consideration contained in 11 U.S.C.A. § 107(d) (1) (e). As that statutory definition is applied to the instant case, consideration for the payment was "fair" if it was received in good faith for an antecedent debt.[2]

[5] All the evidence clearly indicates that there was no scheme to defraud anyone; Coleman had devoted ten months of hard work and was due his salary just as any other employee of the corporation. He asked for it in early 1963 and was asked by Mr. Henderson to wait until a large payment expected from Texaco came in. Coleman agreed to do this. When the payment came in he was paid and so were others. There is nothing to prove that this was done in anticipation of bankruptcy which was filed some 5½ months later. Plaintiffs urge insolvency of the company at the time of payment as being indicative of the lack of "good faith." Were technical insolvency enough to void payment of wages, the corporate officer who made or authorized the payment of wages or other current obligations would be so hamstrung that he could not possibly keep the business going and the employees on the job for fear of having to personally reimburse a trustee in bankruptcy for every payment made during periods of technical insolvency. Such a result would make a mess of the orderliness and finality the bankruptcy statutes seek to provide for the commercial world.

Summarizing our conclusion as to this claim the Court finds that the requisites of a voidable preference under Section 67, sub. d(2), 11 U.S.C.A. § 107, sub. d(2), are not present. There was a fair consideration. The transfer was not part of a scheme to hinder, delay or defraud creditors.

Plaintiffs' demands should be rejected. They are.

CIVIL ACTION NO. 12,200 M. A. HOLAHAN, TRUSTEE IN BANKRUPTCY OF THE RAVEN CORPORATION; AND THE RAVEN CORPORATION VS. J. HARRY HENDERSON

This action under § 70(e) (1), 11 U.S.C.A. § 110(e) (1) is for $27,253.64. The sum of $26,253.64 was paid by Raven Corporation to Texas-Pacific Coal and Oil Company for drilling expenses incurred and assessed for the drilling of the No. 1 Clement Gros Well. Pertinent facts, in chronological order, are:

1. *June 15, 1962*—Paladin Corporation conveyed unto Henderson an overriding royalty interest in certain lands, together with a privilege to convert that overriding royalty interest into a larger working interest.

2. *January 15, 1963*—Henderson agreed to pay his proportionate share for the drilling of Clement Gros Well No. 1.

3. *February 25, 1963*—A copy of an operating agreement bearing this date

---

2. Section 67, sub. d(1) (e) provides that consideration is "'fair' * * * when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied."

Section 67, sub. d(1) defines debt broadly as "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent."

was prepared for the execution of the drillers of the well. A copy was forwarded to Henderson. Under the terms of the agreement the cost of the well was to be borne by the various parties and Henderson was to bear his proportionate part.

4. *March 6, 1963*—Texas-Pacific spudded the test well (Clement Gros No. 1).

5. *May 5, 1963*—Clement Gros Well No. 1 was plugged and abandoned.

6. *June 3, 1963*—Henderson signed the operating agreement on behalf of Raven Corporation. He also forwarded to Texas-Pacific Coal and Oil Company a certified copy of his assignment of his interest to the Raven Corporation.[3] This assignment had been dated April 1, 1963 and was not recorded until May 29, 1963. It is noted that the original operating agreement which had been sent to Henderson was in Henderson's name, but that it was changed to reflect the ownership of the Raven Corporation rather than Henderson, and the acknowledgement was also changed to a corporation acknowledgement. On this date, too, the Raven Corporation forwarded to Texas-Pacific its check in the sum of $26,253.64. This was the amount which Henderson would have owed had the interest been his rather than Raven's.

7. *October 7, 1964*—The corporation filed in bankruptcy.

 On May 5, 1963 the obligation to pay the $26,253.64 was the obligation of Mr. Henderson, who was the owner of the leasehold interest in the well. Mr. Henderson had accepted the obligation on January 15, 1963. If the payment in question had been made several months later it would be voided as being in contravention of 11 U.S.C.A. § 107(d)(2) because of a complete failure of consideration. That section is not applicable because the transfer was not within one year of the bankruptcy petition. However, the payment of this obligation must be set aside under 11 U.S.C.A. § 110(e).[4] We think plaintiff is entitled to prevail under the simple equity remedies available under Articles 21 and 3183 of the Louisiana Civil Code[5] (Shreveport Sash and Door Company v. Ray, 159 So.2d 434 (La.App., 1964). The "doctrine of alter ego" simply passes liability on to the owner of the corporation who in this instance treated its affairs as his own. Raven had no obligation to pay this debt and when Henderson paid it in behalf of Raven, he thereby became liable to the creditors, and through them to the trustee.

 The bankruptcy courts have equity powers in passing on a wide range of problems arising in the administration of bankruptcy estates. They have been invoked to the end that substance will not give way to form, that technical considerations will not prevent substantial justice from being done. Hence, this Court has full power to inquire into the validity of any payments that have been made. Where any contract with a corporation is challenged, the burden is on the sole owner of the corporation to show that the transaction was inherently valid from the viewpoint of both the cor-

---

3. This is the same agreement which had been dated and forwarded to Henderson on February 25, 1963.

4. 11 U.S.C.A. § 110(e)(1): "A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."

5. Article 21: "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."
Article 3183: "The property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors some lawful causes of preference."

poration and those interested therein. The essence of the test is whether or not, under all the circumstances, the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. Normally, the right to set aside a transfer such as this would be enforcible through a stockholder's derivative action, but in the event of bankruptcy of the corporation, such claims are enforcible by the trustee (Pepper v. Litton, 308 U.S. 295, 60 S. Ct. 238, 84 L.Ed. 281).

Summarizing, the creditors of Raven, acting through the Trustee, have the right to bring an action against the dominant stockholder to void the payment by the corporation of an obligation that it did not legally owe. The fact that the debt was not legally owed is a sufficient basis for the exercise by this court of its equitable powers of holding the dominant stockholder responsible to the creditors for this amount. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught, and equity would be perverted as an instrument for approving what it was designed to thwart. The fact that more than one year elapsed between the date of the payment and the bankruptcy petition is no obstacle to equitable relief.

The circumstances of this case are unusual, and the Court, viewing the matter in its entirety, considers that this, in fact and law, is a situation in which the Court is called upon to exercise traditional equity powers of a court in bankruptcy. Here, the debt was owed by Henderson at the time that it was incurred. The assignment to Raven was never accepted by Raven, and the entire transaction must be set aside.

Accordingly, there should be judgment in favor of petitioner and against the defendant in the amount of $27,253.64.[6] This decision is rendered in its entirety on this the 31st day of August, 1967, at Lake Charles, Louisiana.

6. The debt owed by Henderson, which was paid by the corporation to Texas-Pacific was $26,253.64. The additional amount of the judgment represents the $1,000 paid

by Raven to Henderson. This transaction has now been set aside by virtue of this judgment and the trustee should re-convey title to Henderson.